UNITED STATES of America, Appellee,

v.

Phillip A. BONADONNA, Appellant.

No. 84–1829–EA.

United States Court of Appeals,
Eighth Circuit.

Submitted April 12, 1985.
Decided Oct. 15, 1985.

Steven Sadow, Atlanta, Ga., for appellant.

Terry L. Derden, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before ARNOLD and FAGG, Circuit Judges, and HARPER,* Senior District Judge.

HARPER, Senior District Judge.

Appellant-defendant, Phillip A. Bonadonna, appealed from a final adverse judgment of the District Court. The Honorable Elsijane T. Roy entered judgment upon a jury's verdict convicting defendant of Count I, conspiracy to import marijuana and heroin, 21 U.S.C. §§ 952(a) and 962, and of Count II, conspiracy to possess with intent to distribute and to distribute marijuana, 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced defendant to fifteen (15)

* The HONORABLE ROY W. HARPER, Senior U.S. District Judge for the Eastern District of Missouri, sitting by designation.

years imprisonment on Count I and five (5) years on Count II, to run consecutively. The district court also imposed fines of $25,000.00 and $15,000.00 on Counts I and II, respectively.

On appeal, defendant raises five points. He contends that, (1) the government failed to establish proper venue, (2) a plea agreement of a key government witness violated defendant's right to due process, (3) the evidence was insufficient to support a conviction for importation of heroin, (4) the evidence was insufficient to support defendant's conviction for conspiracy with intent to distribute marijuana, and (5) the trial court abused its discretion by denying defendant's motion for continuance. Defendant's challenges to the sufficiency of the evidence require a protracted rendition of the facts.

Since a jury convicted defendant, "[t]he verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the government to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Moreover, substantial evidence includes all reasonable inferences therefrom. *United States v. Lemm*, 680 F.2d 1193, 1199 (8th Cir.1982.) Guided by these principles, we search the record for evidence to sustain the jury's verdict.

From a thorough review of the transcripts, the evidence indicates the principal conspirators to be cousins, Phillip Bonadonna and Charles J. Alaimo. The origin of each conspiracy is unclear. The evidence discloses that overt acts with respect to the conspiracies occurred in seven states and one foreign country over a month's period in the early fall of 1981. The conspiracies involved the services of nineteen individuals, fifteen of whom were indicted by a federal grand jury in Arkansas. The evidence adduced at trial was supplied by seven of the co-conspirators—some indicted

and some unindicted.[1] Using the transcript, legal file and the parties' briefs, we endeavor to reconstruct the overall picture of the conspiracies.

The record discloses that in September, 1981, Bonadonna and Alaimo engaged the services of Bruce Litsky, a registered pharmacist and a known illicit drug broker and smuggler. Litsky testified that he first entered the illicit drug business in the spring of 1981 and was arrested in 1983 for his role as an illicit drug broker.

Litsky's role in this operation to import controlled substances from Colombia, South America was to recruit a pilot and acquire a plane. He, Bonadonna and Alaimo in September, 1981, met and made these arrangements in the office of a jewelry store in Coral Springs, Florida, which was owned and operated by Leonard Wald, a lifelong friend of Litsky, and an acquaintance of Bonadonna. At that meeting, Bonadonna and Alaimo told Litsky that the cargo would consist of 250,000 methaqualone (quaaludes) tablets and eleven packages, the contents of which he need not know.

After this meeting, Litsky sought a fellow drug smuggler named Bob Carson. Carson and Litsky had been partners in a prior operation, smuggling marijuana from Jamaica. Within a couple of days, Litsky and Alaimo found Carson at a motel in Pompano Beach, Florida. Litsky explained to Carson the need for a plane and pilot. In return for his services of providing a plane and pilot, Carson would be given $70,000.00 worth of quaaludes, each quaalude valued at thirty cents.

Once this arrangement was approved by Carson's confederates (one of which was named George Thompson), Carson agreed to the terms. He had no problem finding a plane for the operation. However, the plane began experiencing mechanical difficulties, thereby delaying the flight's departure. Alaimo had set a ten-day time table

to complete the venture, so Litsky began looking elsewhere for his pilot and plane.

His search led him to Delbert Sinor, another fellow drug smuggler and friend. Sinor, Litsky and Carson worked together on the previously mentioned Jamaican operation. He, like Litsky, entered the drug smuggling business in 1980. His luck, also like Litsky, ran out, as he resided in a federal prison at the time of Bonadonna's trial (June 11, 1984). In the fall of 1981, Sinor operated a charter flying service in Mountain Home, Arkansas. The business also included aircraft rentals and student training. Additionally, Sinor occasionally flew into this country illegal narcotics from various places in the Caribbean.

When Litsky contacted Sinor, he informed him of the intended South American drug run. Sinor was interested, so Litsky arranged for Bonadonna, Alaimo and Sinor to meet in Tennessee at the Memphis International Airport. When Bonadonna and Alaimo arrived at the airport for the meeting, they were accompanied by a third individual named William Schlicter, a/k/a "Uncle George." Shortly after the trio arrived, Alaimo made initial contact with Sinor. He asked Sinor to call Litsky in Florida. On the telephone, Litsky talked to each man to verify one another's identification. At this point, Alaimo led Sinor to Bonadonna, who was introduced to Sinor as "Philly." When Sinor testified at Bonadonna's trial, he identified the defendant as the man called "Philly."

From the airport, the group proceeded to the offices of Dr. Stanley Depee in Memphis. Dr. Depee was a doctor of veterinary medicine and a drug trafficking partner of Sinor. At the time of Bonadonna's trial, both Depee and Sinor were in federal prison for illegal drug activities. In September, 1981, Sinor and Depee, along with a third partner named Ken Stanton, operated an illicit drug business in the Memphis area. This trio formed a corporation

**1.** 

| Testifying Co-conspirators | Indicted |
| --- | --- |
| Bruce Litsky | No |
| Bob Carson | Yes |
| George Thompson | Yes |

| Testifying Co-conspirators | Indicted |
| --- | --- |
| Delbert Sinor | No |
| Stanley Depee | No |
| Ben Rothwell | No |
| Frank White | No |

named Commercial Brokerage, Inc. to launder money from their illicit drug dealings. As a front, their corporation conducted business in real estate, stocks and bonds, and in renovating old property.

In Dr. Depee's offices, this group held several meetings. The attendance at these meetings consisted of Bonadonna, Alaimo, Uncle George, Sinor, Depee and Stanton. Their discussions focused on the importation of cocaine, marijuana and quaaludes from South America and the preparations necessary for such a venture. Also, at this time Alaimo paid Sinor $15,000.00 as a down payment for the trip.

The next morning following these meetings, Sinor met Alaimo privately outside his Memphis hotel. As the two men drove around the block in Sinor's car, Alaimo asked Sinor if he had any aversion to flying heroin into the country. Sinor responded that he preferred not to haul such a cargo. Alaimo then assured him that this cargo would only consist of marijuana and maybe some cocaine. In the future, Alaimo wanted to import heroin and would need a pilot for the job.

To effectuate this smuggling operation, Sinor and another individual named Ben Rothwell stole a Titan 404 aircraft from the Dewitt Spain Airport located on the north side of Memphis. Rothwell, a former stock broker, learned to fly to better serve his clientele in Northern Arkansas. He leased his planes through Ark-Mo Aviation, the company owned by Sinor in Mountain Home. He became involved with Sinor's illicit drug business in December, 1981 as a pilot for the Jamaican operation.

The two pilots flew the stolen Titan 404 to Cherokee Village, Arkansas. Sinor became familiar with the Cherokee Village area from using a local landing site for his Jamaican illicit drug runs. While the Titan 404 was in Arkansas, the conspirators intended to prepare it for the long journey to South America. A fuel bladder had to be installed so that extra fuel could be carried and the plane's flight range extended. Also, since much of the flight plan entailed crossing the Gulf of Mexico and the Carib-

bean Sea, survival gear [life raft, flares, electronic locator transmitter (ELT), extra provisions, maps and oxygen tanks] had to be carried in case the plane went down at sea.

When the plane arrived in Cherokee Village, the pilots noticed a suspicious van parked on the edge of the ramp. At the Cherokee Village airfield, the pilots rendezvoused with Alaimo, Uncle George, Depee and Sinor's younger brother, Larry. They had traveled into Arkansas ahead of the plane with the fuel bladder and survival gear. Regarding the van, they agreed with the pilots' suspicions. Thus, fearing that the van might contain narcotics agents who had discovered the group's intention, the pilots returned the stolen aircraft to the Dewitt Spain Airport.

Undaunted by their failure, the conspirators devised a second plan at yet another meeting in Memphis. By now, Litsky had arrived in town from Florida and attended the meeting. There, Litsky paid Rothwell $20,000.00, of which $10,000.00 came from Bonadonna, as an advancement on his fee for his services as pilot.

After their aborted attempt with the Titan 404, the group decided to purchase a plane owned by Commercial Brokerage, Inc. Their second attempt would be made with a Beechcraft D-18. This plane was located in Horseshoe Bend, Arkansas. Prior to stealing the Titan 404, Sinor flew the D-18 to Horseshoe Bend from the Dewitt Spain Airport. This was done as a diversionary tactic to throw any would-be surveillance off the track. After the first attempt failed, the D-18 was moved to Theodoshea, Missouri.

By the time the plane reached Theodoshea, Alaimo, Litsky, Depee, Stanton and Uncle George were there waiting with the fuel bladder. There, the bladder was installed, but, in an effort to stay one step ahead of the authorities, Sinor and Rothwell, accompanied by Alaimo and Litsky, flew the plane to Crystal River, Florida. The conspirators chose this Florida site at the behest of Uncle George. Uncle George claimed that he had a friend in town named

Theodore Baranowski who supposedly had the sheriff "in his pocket."

As the group of conspirators moved the operation to Crystal River, Erwin Layne returned to Colombia. Layne had been in South America arranging the purchase of the illegal cargo while the plans to acquire an airplane and assemble a crew proceeded in the United States. During the last meeting in Memphis, Litsky learned that the primary cargo consisted of the eleven packages. As extra cargo, the plane would be carrying marijuana or quaaludes to help finance the venture. The determination of extra cargo could only be made upon the plane's arrival in Colombia, as it depended solely upon the availability of illicit drugs at that time.

When Layne returned to Colombia, the group of Alaimo, Litsky, Sinor, Rothwell, Uncle George and Baranowski worked in Crystal River preparing the plane for its flight to South America. Prior to fueling the plane, Alaimo spoke privately with Litsky. In this conversation he told Litsky that the eleven packages would contain heroin destined for New York City, that he wanted to know if the pilots should also be so informed, and that this flight was merely a trial run for two hundred more packages of heroin. Alaimo also revealed the reason why they were smuggling heroin from a country known principally for cocaine and marijuana. He explained that a chemist from the former French Connection moved his operation from France (Marseilles) to Colombia. The move was not without complications, as a chemical needed to complete the purification process was unavailable locally. This last step, however, could easily be done in this country.[2]

Evidently, Baranowski did not have the local sheriff "in his pocket," as represented, since that night, as Litsky, Uncle George and Baranowski loaded the plane with supplies, the local police interrupted and questioned them at length concerning their identities and activities. Also, later that same night, a police officer chased Rothwell from the airstrip, who had to make his way back to his hotel room via the swamps. After the night's episodes with the Crystal River police, the conspirators abandoned the D–18 as it sat at the airfield.

After failing a second time, Litsky recontacted Carson to see if Carson had located a serviceable airplane. Carson met with Bonadonna and Alaimo. Carson testified that the defendant Bonadonna was introduced to him as Alaimo's partner. At this meeting, Bonadonna agreed to pay Carson $156,000.00 for his services. In turn, Carson contacted Frank White about leasing a plane.

White owned and operated a successful business in highway construction and mining, but had also become involved in drug smuggling as a supplier of airplanes. After being contacted by Carson, White met initially with Carson and Uncle George to discuss the use of White's Piper Navajo. It was agreed that the plane could be leased for $50,000.00. White demanded full payment prior to delivery, but Carson could only raise $20,000.00. Later, after meeting with Bonadonna and Alaimo, White permitted the group of conspirators to use his plane.

White testified that at this meeting he met "Phil," who he later identified in court as the defendant Bonadonna. White testified further that during this meeting with Bonadonna, the other persons present openly discussed importing marijuana from South America. Although Alaimo acted in charge of the meeting, Bonadonna appeared "like he had control of the thing" [smuggling operation]. White continued by testifying that he almost withdrew his plane from the deal upon learning of the group's previous unsuccessful attempt at Crystal River.

Also present at this meeting of Bonadonna and White were Carson, Rothwell, Uncle George and Gene Croft, a pilot for White.

2. See Transcript, p. 412, line 20 to p. 417, line 22, for Litsky's testimony concerning Alaimo's explanation of the cargo's nature and planned disposition of it.

Rothwell had never flown a Piper Navajo, so Croft took him for a check ride on the plane. After Croft was satisfied that Rothwell could handle the plane, the deal became final.

Shortly thereafter the plans were finalized, and Alaimo, Rothwell and Verlin Siefkes departed Leesburg, Florida, destined for Santa Marta, Colombia. Verlin Siefkes was a pilot experienced in flying illicit drugs into this country from South America. He had recently flown a mission for White and, at the time of this flight, needed additional funds in order to flee the country and a pending prosecution on another drug charge. Siefkes was hired to co-pilot the plane because Rothwell would need help over the course of such a long flight (eight hours expected flight time). Also, Siefkes had a friend who could supply the airstrip at Santa Marta.

Upon landing in South America, the three men rendezvoused with Layne. Layne had nine bales of marijuana and a blue satchel waiting for them at the airstrip. The contraband was loaded into the plane by Rothwell with the aid of some Colombian nationals; Siefkes serviced the plane for its return flight; and Alaimo took the blue satchel from Layne.

After the plane's refueling, the three men left Santa Marta bound for Soperton, Georgia. The Soperton landing site was chosen because Bobby Tyson owned a farm with a house next to the airstrip. From this house the ground crew could coordinate their activities. When the plane landed in Georgia, the nine bales of marijuana (450 pounds) were off-loaded and stored at a house rented by George Thompson and located near Soperton. The rented house was used as a "stash" house where the marijuana was stored until its distribution.

As the off-loading started, Alaimo left the plane carrying the blue satchel and promptly disappeared. The plans called for Alaimo to exit the plane and find his way through the woods to Tyson's farm house. There, Litsky would be waiting to drive Alaimo into town, where the blue satchel would be turned over to Bonadonna's brother-in-law, Jim Schicchi. Schicchi would then board a bus bound for New York City. In New York, Schicchi would re-deliver the blue satchel to Alaimo.

Meanwhile, as Alaimo wandered in the woods, the pilots departed Soperton in the Piper Navajo, bound for Waycross, Georgia. Unbeknownst to the pilots, the United States Customs Service was in hot pursuit, and eventually caught up to them in Waycross. There, the Customs Service seized the plane and found not only all the survival gear and fuel bladder, but also marijuana seeds in the plane. Siefkes and Rothwell were arrested and placed in jail.

To locate Alaimo, Litsky contacted Bonadonna, who told Litsky that Alaimo could be found in a motel on the other side of town. The two conspirators met. Litsky observed that Alaimo still possessed the blue satchel and that it contained packages the size and shape of small footballs. Alaimo told him that there were a total of eleven packages. Now, Litsky and Alaimo put Bonadonna's brother-in-law and the blue satchel on a bus destined for New York.

As for the marijuana, it was loaded into an old Mercury at the stash house and transported to Lexington, Kentucky by Thompson and Stanley Terry. Litsky and Alaimo followed in a second car until the caravan reached Atlanta. From Atlanta, Litsky and Alaimo flew on to Lexington, where they met Rebecca Stein, Alaimo's girlfriend. Stein had been in Lexington arranging the marijuana sale. By the time Thompson and Terry reached Lexington with the contraband, Stein had found a purchaser and had arranged the sale.

A week later, Litsky heard from Alaimo that the imported heroin was of such poor quality that it was unmarketable. Alaimo also gave Sinor this same report. Sinor had contacted Alaimo at the behest of Rothwell, who had been sitting in a Waycross jail. Rothwell was seeking the balance due him from his piloting services.

Litsky hired a chemist to clean the heroin, but all attempts to improve its quality failed. As a result, no additional funds were ever disbursed to the other conspirators.

Initially, defendant contends that the government failed to establish proper venue in the Eastern District of Arkansas. Defendant suggests that the government's evidence establishes an additional conspiracy. This putative conspiracy arose after the aborted flight of the Beechcraft D–18. He claims that the initial plan to import marijuana was abandoned with the seizure of the D–18 and then reorganized in Georgia and Florida with new members. Since only the initial marijuana importation conspiracy had any Arkansas connection, trying it all together was prejudicial to him. We note that the issues of venue and multiple conspiracies were submitted to the jury and decided in favor of the government.

■ In his brief, defendant correctly asserts that the government bears the burden of proving by a preponderance of the evidence that venue was proper in Arkansas for each charge of conspiracy. *United States v. Hopkins,* 529 F.2d 775, 777 (8th Cir.1976). For the government to succeed, it must cause the jury to believe "that venue as to prosecution of all members of a conspiracy lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." *United States v. Overshon,* 494 F.2d 894, 900 (8th Cir.1974) (hereinafter referred to as *Overshon* ). Defendant does not contend that venue was improper up and through the abandonment of the Beechcraft D–18 in Crystal River, Florida. Thus, the jury need only believe that the flight of the Piper Navajo from Leesburg, Florida was part of the same conspiracies with Arkansas connections.

From the testimony of seven members of the conspiracies, the government showed that Bonadonna and Alaimo, through Litsky, conspired to import two controlled substances and to distribute one of them. The controlled substances were to consist of a drug in eleven packages, and either quaaludes or marijuana to finance the smuggling of the other drug.

To effectuate their intentions, Litsky originally contacted Carson as one who could supply an airplane and crew. When Carson proceeded too slowly for Alaimo's timetable, Litsky turned to Delbert Sinor. Sinor and his men made two unsuccessful attempts to retrieve the contraband from Colombia, South America. Their attempts were made with the Titan 404 and Beechcraft D–18. Sinor and his crew performed several acts in Arkansas in furtherance of these conspiracies, including flying the Titan 404 to Cherokee Village (Sinor and Rothwell) and the Beechcraft D–18 to Horseshoe Bend (Sinor).

After the aborted attempt with the D–18 in Crystal River, Litsky re-contacted Carson about his plane and crew. Carson leased a Piper Navajo from White. Rothwell, Siefkes and Alaimo flew this plane to Colombia, South America, where Layne had the eleven packages and marijuana waiting for them. The plane hauled their illegal cargo back to the United States; Schicchi carried the eleven packages to New York City; and Thompson and Terry transported the marijuana to Lexington, Kentucky, where it was sold by Alaimo and Litsky to a pre-arranged buyer.

■ Under the totality of these circumstances, *United States v. Burchinal,* 657 F.2d 985, 994 (8th Cir.1981) (hereinafter referred to as *Burchinal* ), this court concludes that the government's evidence adequately shows "a common aim or purpose," *United States v. Jackson,* 696 F.2d 578, 582 (8th Cir.1982) to import and distribute controlled substances. Moreover, from the evidence presented, the jury could reasonably find that the flight of the Piper Navajo from Leesburg was part of the same conspiracies which produced the two unsuccessful attempts having connections with Arkansas. Thus, the government has successfully met its burden of establishing proper venue in Arkansas.

Next, defendant contends that Litsky's plea agreement and his conduct subsequent to its execution results in a violation of defendant's right to due process. Defendant also argues that Litsky's plea agreement with the government was an impermissible invitation to commit perjury. The part of Litsky's plea agreement objectionable to defendant reads as follows:

"The United States Government will make known to any sentencing court, or parole board, the nature and extent of Mr. Litsky's cooperation and its value to the Government * * * *[T]he recommendation of the government concerning [Litsky's] incarceration at time of sentencing may be less than five (5) years based upon a subjective evaluation by the Government of the nature and scope of Mr. Litsky's cooperation." (Defendant's emphasis.)

In defendant's opinion, the emphasized language induces Litsky to exaggerate defendant's alleged crimes to enhance Litsky's prestige with the government. In support of his opinion, defendant relies heavily upon *United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984) (hereinafter referred to as *Waterman*). However, defendant's reliance is misplaced.

Unlike the case at bar, the *Waterman* district court held a hearing where defense counsel presented exhibits, stipulations of counsel, and argument regarding the allegedly improper agreement. From this hearing, it found the government's agreement with its key witness to be contingent upon the rendering of an indictment. The district court also concluded that the agreement was not fundamentally unfair to the defendant. Judge Heaney of this circuit, author of *Waterman*, disagreed with the district court's conclusions. He viewed "[s]such an agreement [as] nothing more that an invitation to perjury having no place in our constitutional system of justice." *Id.* at 1531. He was "convinced that due process cannot be interpreted to allow

the government to reward its witnesses based upon the results of their testimony." *Id.* at 1533. Notwithstanding Judge Heaney's views, *Waterman* was considered by this Court en banc, which divided equally as to the district court's handling of the matter. As a result, the district court was affirmed.[3]

■ In the case at bar, Litsky's plea agreement required the government to reward Litsky based only on the nature and scope of his cooperation. A jury's acquittal could not have jeopardized Litsky's reward, while a guilty verdict did not insure a stronger recommendation from the government. In other words, Litsky had no stake in the outcome of the litigation. Thus, even if the defendant can find legal support in *Waterman*, factually, Litsky's plea agreement differs from the one in that case.

In connection with Litsky's plea agreement, defendant also complains of two other due process violations. In a motion before the district court for a new trial based on newly discovered evidence, the defendant contended that he was deprived of effectively cross-examining Litsky to the fullest extent possible. This deprivation resulted from information the defendant acquired after his trial. First, Litsky continued to deal drugs subsequent to and in violation of a provision in his plea agreement. Evidently, in January 1984 Litsky received a kilogram of cocaine which he never reported to any federal authority. In his plea agreement, Litsky promised to refrain from any criminal activity when acting as a government informant. And second, the defendant discovered six undercover tapes containing conversations between him and Litsky.

In its order denying defendant's motion, the district court expressly found the tapes to contain nothing exculpatory. At most, the evidence would be impeachment of Litsky. Similarly, evidence of Litsky's additional drug dealings could be used only to

---

**3.** See *U.S. v. Saterdalen*, 769 F.2d 494 (8th Cir. 1985) for another recent opinion on the legal precedential value of *Waterman*.

further impeach Litsky's credibility notwithstanding defendant's assertion that it shows a plot between the government and Litsky to target defendant for prosecution.

■■■ The trial court has broad discretion when ruling on a motion for a new trial based on newly discovered evidence, and its discretion will not be reversed absent a clear abuse of discretion. *United States v. Wallace*, 578 F.2d 735, 742 (8th Cir.1978). Moreover, newly discovered evidence which is merely impeaching normally cannot form the basis for a new trial. *Id.* at 742. Since the newly discovered evidence could only serve to impeach Litsky's credibility, we conclude that no abuse of discretion occurred.

In Points III and IV, defendant contends that the evidence was insufficient to convict him of conspiracy either to import heroin or to distribute marijuana. He does not challenge the existence of either conspiracy. Rather, defendant simply maintains that the government adduced no evidence indicating that he agreed to import heroin or that he participated in the distribution of the marijuana in Kentucky.

"To convict one of criminal conspiracy the Government must show that the individual entered into an agreement with at least one other person, that the agreement had as its objective a violation of law, and that one of those in agreement committed an act in furtherance of the objective." *United States v. Evans*, 697 F.2d 240, 245 (8th Cir.1983). Considering the nature and scope of defendant's contentions, we conclude that the only element of criminal conspiracy at issue on this appeal is the defendant's conspiratorial membership. "[T]he law in this Circuit is quite clear that an individual becomes a member of a conspiracy when the person knowingly contributes his or her efforts in furtherance of the objectives of the conspiracy * * *." *United States v. Michaels*, 726 F.2d 1307, 1311 (8th Cir.1984) (hereinafter referred to as *Michaels*), quoting *Burchinal* at 990. "[O]nce the existence of a conspiracy has been established, even slight evidence connecting a particular defendant to a conspir-

acy may constitute proof of the defendant's involvement in the scheme to render him culpable." *Id.* at 1311, *quoting Overshon* at 896. Also circumstantial evidence is no less probative than direct evidence and a conviction based solely on circumstantial evidence is subject to the same principles of review. *Michaels* at 1311. "Furthermore, while the evidence must be consistent with guilt, it need not be inconsistent with every other reasonable hypothesis. The essential question is whether the entire body of evidence is sufficient to convince the trier of fact, beyond a reasonable doubt, that the defendant is guilty. Finally, the jury must determine the issue of intent from all the circumstances of the case because the element of knowledge is rarely capable of direct proof." *United States v. Reeves*, 730 F.2d 1189, 1195 (8th Cir.1984).

■■■ Our review of the record reveals a substantial amount of circumstantial evidence from which a jury could have found beyond a reasonable doubt that Bonadonna knowingly participated in conspiracies to import heroin and to possess with intent to distribute and to distribute marijuana. Based on the testimony of seven co-conspirators, the jury could have reasonably inferred that Bonadonna was the leader of the conspiracies, that he supplied the working capital for the venture, and that he permitted his partner and cousin, Alaimo, to manage the operation for him.

The transcript contains ample testimony indicating that the cargo of this smuggling operation consisted of two kinds of controlled substances. The primary cargo took the form of eleven packages carried in a blue satchel. It was so important that Alaimo himself, Bonadonna's partner and cousin, accompanied the pilots on the flight. In South America, Alaimo took the satchel directly from Layne, while one pilot tended to the plane and the other loaded the extra cargo. As extra cargo of secondary importance, the smugglers hauled marijuana to finance the whole operation. The conspirators planned for quaaludes or mari-

juana. Its final determination depended upon the arrangements Layne could make with the suppliers in South America.

■ From the inception of the conspiracies, the plans called for the eleven packages to be hauled as part of the cargo. There was never any doubt as to its inclusion in the total shipment from Colombia. Originally, Bonadonna and Alaimo acted secretively; they told Litsky that he need not know the contents. Juxtapose Alaimo's private inquiry of Sinor about hauling heroin and you create an inference that the eleven packages contained heroin. Nevertheless, as the Beechcraft D–18 was being prepared for its flight from Crystal River, Alaimo revealed to Litsky the true content of the eleven packages. He explained to Litsky why such a cargo was being imported from a country known for cocaine and marijuana. Litsky, in turn, conveyed all this information to the jury. Hence, the real issue is not sufficiency, but credibility. Credibility—the decision as to the weight to be accorded the testimony of a witness—rests with the jury.

■ Similarly, from their inception, the conspiracies called for a second drug, quaaludes or marijuana, to help finance the operation. In furtherance of this plan, Alaimo and Litsky sold the extra cargo of marijuana in Lexington, Kentucky. Defendant, as a member of this conspiracy, is culpable for everything said, written or done by any of the other conspirators in furtherance of the common purpose of the conspiracy. *Overshon* at 896.

Lastly, defendant contends that the trial court abused its discretion by denying his motion for a continuance. With his motion, defendant simply sought additional time to prepare his defense. As justification, defendant claims that his counsel was preparing his defense for an impending, more complex, criminal trial in the Northern District of Georgia. At the time of Bonadonna's trial in the Eastern District of Arkansas, he faced charges of continuing criminal enterprise (CCE) and racketeer-influenced and corrupt organization (RICO) in Atlanta, Georgia.

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process * * * [citation omitted]. There are no mechanical tests for the deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Unger v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).[4]

A review of the record reveals that the indictment was released January 20, 1984, and that defendant was arraigned March 2nd. Defendant was represented by appointed counsel at his arraignment; the district court ordered new counsel appointed April 17th. Between arraignment and appointment of new counsel, the government sought and was granted a continuance on March 29th. Defendant's trial, which was originally scheduled for April 9th, was continued for two months, to June 11th. On March 23rd and May 11th, the government disclosed one hundred pages and sixty pages, respectively, of discovery material to defendant stemming from his discovery motion of March 12th. Lastly, on June 5th, the government released to defendant four hundred pages of Jencks Act materials and made available transcripts of two government witnesses from prior trials. The government waived its right to withhold such information until trial, see 18 U.S.C. § 3500, and Rule 26.2, Federal Rules Criminal Procedure, to facilitate a smooth and fair trial.

---

**4.** With the passage of the Speedy Trial Act of 1974, a list of factors, among others, which a judge shall consider in determining whether to grant a continuance, may be found at 18 U.S.C. § 3161(h)(8)(B). An additional, overlapping, set of factors may be found in *United States v. Bernhardt*, 642 F.2d 251, 252 (8th Cir.1981).

In late May, approximately two weeks prior to trial, defendant decided that he preferred the representation of his Atlanta attorney. This attorney had been retained by defendant and was preparing a defense with respect to the criminal charges pending in Atlanta, Georgia, which concerned matters related to this case. On the eve of trial (June 5th), the defendant sought a continuance so that his Atlanta attorney could further familiarize himself with the facts of this case. The next day the district court conducted a hearing on defendant's various pretrial motions, which included not only the continuance, but also motions to dismiss for improper venue and for delay in prosecution, a motion in limine, and a motion to merge Counts I and II of the indictment.[5] Most of these motions were argued by defendant's Atlanta counsel.

As a result of this hearing, the district court found no extenuating circumstances warranting a continuance. Further, the court made specific findings that defendant's appointed counsel was an outstanding attorney, who had gone to Atlanta to confer with his client, and that both defendant and his retained counsel were derelict in their duty to notify the court of defendant's desired representation. From these findings, the district court denied defendant's motion for continuance.

■ Considering the pretrial history of this case, we believe that the district court properly exercised its discretion. Moreover, after examining the transcripts of the court proceedings of this case, we find that defendant's retained counsel was, in fact, well prepared to defend his client.

Accordingly, we affirm the judgment of the trial court.

5. In the indictment, the government brought three counts of conspiracy against defendant. Counts I and II pertained to the importation of marijuana and heroin, respectively. Count III pertained to the distribution of marijuana. The district court had previously entered an order stating it would merge Counts I and II at the sentencing phase. At the behest of defendant's

Atlanta counsel, the district court reconsidered its earlier order and concluded that Counts I and II should be merged prior to trial. Thus, the jury received special verdict forms indicating only two counts—Count I, importation of marijuana and heroin, and Count II, distribution of marijuana.