**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Louis MILLER, Jr., Defendant–Appellant.**

No. 88–8714.

United States Court of Appeals, Eleventh Circuit.

May 4, 1992.

---

William A. Morrison, Atlanta, Ga. (Court-appointed), for defendant-appellant.

Mary Jane Stewart, Asst. U.S. Atty., Atlanta, Ga., Geoffrey Brigham, U.S. Dept. of Justice, Crim. Div., Appellate Section, Washington, D.C., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, and DUBINA, Circuit Judges, HENDERSON and CLARK, Senior Circuit Judges.

ANDERSON, Circuit Judge:

Louis Miller was convicted of knowing distribution of cocaine in violation of 21 U.S.C. § 841, and conspiracy to knowingly distribute cocaine in violation of 21 U.S.C. § 846. Miller was sentenced to 15 years on each count, to run concurrently. On appeal, Miller challenges his conviction on several grounds. A panel of this court concluded that the district court committed reversible error by admitting extrinsic evidence under Fed.R.Evid. 404(b). 883 F.2d 1540 (11th Cir.1989). The panel opinion was vacated when the case was ordered to be reheard en banc. 923 F.2d 158 (11th Cir.1991). The case was submitted to the en banc court for rehearing on October 7, 1991. We now affirm, concluding that Miller's several claims of error are without merit. We discuss only Miller's claim that the district court erred in admitting extrinsic evidence under Fed.R.Evid. 404(b), finding that the other issues raised by Miller on appeal are without merit and warrant no discussion.

## FACTS [1]

The offense charged in the instant indictment occurred on January 7, 1987. The subsequent extrinsic act which was admitted into evidence pursuant to Rule 404(b) occurred on September 3, 1987. The rele-

1. This statement of facts borrows liberally from both panel opinions, the majority and the dis-      sent.

vant facts surrounding the January 7, 1987, offense charged in the instant indictment are as follows. Acting in an undercover capacity, Special Agent Bledsoe of the Drug Enforcement Administration (DEA) and a confidential informant contacted Labron Lyons at his mother's house in order to buy some cocaine. Lyons accommodated them by calling the beeper number of his supplier. Lyons told Agent Bledsoe and the informant that "Louis" would bring the cocaine to him. Agent Bledsoe then waited in her car in the driveway of the house. Several minutes later, a blue Pontiac Grand Am pulled in behind her. Agent Bledsoe identified Miller in court as the driver of the vehicle. She had observed Miller by looking into her vehicle's rear view mirror, and had recognized him as the person she had met during an earlier undercover investigation in which she and her partner had approached Miller to discuss purchasing cocaine.

After Miller pulled the Pontiac Grand Am into the driveway in back of Agent Bledsoe's car, Lyons got into Miller's car. The car pulled away, drove around the block, then returned and dropped Lyons off. When Lyons returned, he had an ounce of cocaine.

During the trip around the block, Agent Harvey, who was conducting surveillance, observed the Grand Am, observed Lyons in the front passenger seat, and observed Louis Miller driving. At the point when Agent Harvey first saw Miller at the wheel of the car, he was so close that the agent became concerned about being discovered by the targets of the surveillance. Agent Harvey continued the surveillance after Miller returned to Lyons' mother's house and dropped Lyons off. He observed that only Louis Miller was in the car. During this surveillance, Agent Harvey saw Miller stop, get out of the car, and make a telephone call from a pay telephone.

The relevant facts surrounding the subsequent extrinsic offense, which occurred on September 3, 1987, are as follows. In the interim between January 7, 1987, and September 3, 1987, Labron Lyons had been arrested on unrelated charges and had agreed to cooperate with the government. Pursuant to the plan, Lyons called Miller's beeper number. Miller returned the call, and that telephone conversation was taped. In the taped telephone conversation, Miller agreed to deliver cocaine to Lyons at Lyons' mother's house. Lyons gave Miller no directions as to how to get to Lyons' mother's house. Significantly, the taped telephone conversation referred to the earlier January transaction. In setting up the September 3 transaction, Miller inquired if Lyons would be alone for the drug delivery. Lyons responded that his client would have to ride with them, because she would not leave the money. Then, to reassure Miller, Lyons indicated that the client was the same one they had dealt with before. Lyons had opened the conversation by telling Miller that he had some people from out of town, indicating that they had been there a couple of months before—"I got these people here from out of town ... know about a couple of months back?" Later in the conversation, when Lyons was attempting to reassure Miller that the client was one they had dealt with before, Lyons described for Miller the earlier January transaction. Lyons told Miller that this client was the same one who had parked in his mother's driveway, and that Miller had pulled in behind her. Miller's response in a taped conversation indicates that he was reassured, and he agreed to meet Lyons and the client at Lyons' mother's house.[2]

2. The tape of the September 3, 1987, telephone conversation provides in relevant part:

    Lyons: I got these people here from out of town ... know about a couple of months back?
    Miller: Uh huh.
    Lyons: Yeah. They want to get two of those things....
    Miller: Uh. You gonna be by yourself?

    Lyons: Oh, well, uh. One of 'em gonna ride with me, 'cause, uh, she don't want to leave her money....
    Lyons: It's the same one, uh, you know when you had brought it up in front by the driveway over to my mama's house ... you remember when the girl parked in the driveway over to my mama's house?
    Miller: Uh huh.

Several minutes after the telephone conversation, Miller arrived in a blue Monte Carlo automobile driven by Nathan Collins. Lyons got into the car with Miller, and they again drove around 3–4 minutes before returning to Lyons' mother's house. At that time, Lyons asked Miller to wait until the buyer approved the drugs (i.e., two ounces of cocaine); Miller was then arrested. A search incident to arrest revealed a quantity of cocaine and $849 on Miller's person.

At the trial for the January offense, the government introduced the subsequent extrinsic September transaction. Upon defendant's objection, the government asserted that the extrinsic offense was admissible to prove identity or modus operandi. Miller claims on this appeal that the district court erred in admitting the extrinsic offense evidence.

### DISCUSSION

Fed.R.Evid. 404(a) provides that evidence of a defendant's character is not generally admissible to prove that he acted in conformity therewith on a particular occasion. Rule 404(b) provides that evidence of other crimes is not admissible to prove defendant's character in order to show action in conformity therewith. However, extrinsic crime evidence is admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[3]

■ The leading case in this circuit on Rule 404(b) evidence is *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). The *Beechum* analysis has now been confirmed by the Supreme Court in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). A three-part test has evolved for evaluating the admissibility of Rule 404(b) evidence. First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis,[4] there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. *Huddleston*, 485 U.S. at 689, 108 S.Ct. at 1501, citing *Beechum*, 582 F.2d at 912–13. Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

■ In reviewing the district court's decision admitting Rule 404(b) evidence, we are governed by the abuse of discretion standard. *United States v. Edwards*, 696 F.2d 1277, 1280 (11th Cir.), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983); *United States v. Roe*, 670 F.2d 956, 967 (11th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982).

The extrinsic offense in this case, i.e., the September 3, 1987, offense, was admitted to prove identity or modus operandi.[5] It was admitted to prove that the perpetrator of the January 7, 1987, offense was the same person who committed the extrinsic offense. Of course, it was clear that defendant was the person who committed the extrinsic offense; he was arrested immediately.

Miller's argument on appeal focuses on the first prong of the *Beechum* test; Miller argues that the extrinsic offense was not relevant to the issue of the identity of the supplier of cocaine in the January offense

---

Lyons: Yeah, it's her, when you had pulled up behind.

Miller: Well, you want me to meet you over to your daddy's, your mama's house?

3. Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

4. The sufficiency prong is part of the relevance prong because the extrinsic act would not be relevant unless the extrinsic act occurred and the actor was the defendant.

5. Since we conclude that the district court did not abuse its discretion in admitting the evidence to prove identity, we need not address the government's alternative arguments that the evidence was also admissible to prove intent and to corroborate Lyons' testimony.

with which defendant was charged in the instant indictment. Miller argues that the September extrinsic offense was not sufficiently similar to the charged offense to be relevant on the issue of identity.

■ When extrinsic offense evidence is introduced to prove identity, "the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi." *United States v. Beechum*, 582 F.2d 898, 912 n. 15 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). *United States v. Lail*, 846 F.2d 1299, 1301 (11th Cir.1988).

■ We conclude that the similarity of the two offenses in this case is sufficient to mark the offenses as the handiwork of the accused. This case is unusual in that the circumstances surrounding the extrinsic September transaction include some direct evidence that Miller was the supplier in the earlier January transaction. In the taped September 3 telephone conversation, Lyons referred to and described the earlier January 7 transaction as one in which both Lyons and Miller were involved. There is some indication on the tape that Miller recognized and remembered the earlier January 7 transaction. In addition, there is other evidence demonstrating the strong similarity between the two offenses. Most importantly, during the January 1987 transaction, Lyons told Agent Bledsoe that he was calling his supplier, "Louis." It is clear that Lyons called Louis Miller as his supplier in the subsequent September 1987 transaction. Thus, in both transactions Lyons dealt with a supplier named "Louis." In addition to this important similarity, there is other evidence of similarity. In both transactions, the meeting place was the same residence, Lyons' mother's house. In both transactions, the supplier arrived at the residence within several minutes. In both telephone calls setting up the cocaine deliveries, it was not necessary for Lyons to give the supplier any directions to locate the residence. The significance of this fact is the inference that Miller was a regular

supplier; a supplier who knows the address is likely to have supplied on earlier occasions. Of course, this inference is also supported by the reference to the previous transaction in the taped September 3 telephone conversation. Finally, in both transactions the supplier arrived by car, Lyons got in the car, the car drove around the block during which time the exchange of drugs for money occurred, and then the car returned to the residence and dropped Lyons off.

We conclude that similarities between the two transactions provide strong evidence that the supplier in both transactions was the same person. It may be true that many drug transactions are set up by dialing a beeper number, followed by a telephone conversation. However, it would be a rare coincidence for different suppliers, both named Louis, to arrive within the same several minute period. Of course, it is possible that Lyons had two different suppliers who operated from a location approximately equidistant from Lyons' mother's house. However, the fact that both suppliers in the instant case were named "Louis" makes the possibility that there were two different suppliers quite remote. That possibility is even more remote in light of the taped September 3 conversation in which Lyons and Miller talked about and seemed to remember the earlier January 7 transaction. Considering the totality of the circumstances, we conclude that the district court did not abuse its discretion in concluding that the two offenses were sufficiently similar to mark them as the handiwork of the accused. *See United States v. Stubbins*, 877 F.2d 42 (11th Cir.), *cert. denied*, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989); *United States v. Messersmith*, 692 F.2d 1315 (11th Cir.1982).

■ Having concluded that the district court did not abuse its discretion in applying *Beechum*'s first prong—i.e., that the extrinsic offense was relevant to prove identity—we turn briefly to the other two prongs. We conclude that the district court did not abuse its discretion with respect to the third prong; the probative value of the extrinsic offense in proving

the identity of the supplier in the charged offense was not substantially outweighed by undue prejudice. Identity was a key issue at trial. The defense suggested an alibi defense and attempted to impeach the government witnesses' identification of Miller as the supplier in the January charged offense. By contrast, Miller's identity as the supplier in the extrinsic offense was conclusively established by his immediate arrest. The extrinsic offense had considerable probative value on the issue of the identity of the supplier in the charged offense. As discussed above, the possibility is quite remote that Lyons had two different suppliers, both named "Louis," and both operating from a location approximately equidistant from Lyons' mother's house. Moreover, in the taped September 3 conversation, Miller seemed to remember the earlier January transaction. Under these circumstances, the fact that Miller supplied the cocaine in the extrinsic offense is strong evidence that he was also the supplier of the cocaine in the charged offense.

Finally, with respect to the second prong set out above, we readily conclude that there was ample evidence that Miller committed the extrinsic offense. As mentioned above, he was actually arrested on the spot.

For the foregoing reasons, we conclude that the district court did not abuse its discretion in admitting the Rule 404(b) evidence.

AFFIRMED.

KRAVITCH, Circuit Judge, concurring in the judgment:

I agree with Judge Clark that the district court abused its discretion by admitting evidence regarding the September transaction, and thus disagree with the majority that evidence of the September transaction was admissible under Rule 404(b). I write separately, however, because I believe that the error was ultimately harmless.

The majority "conclude[s] that the similarity of the two offenses in this case is sufficient to mark the offenses as the handiwork of the accused." Majority op. at 1539. But there are as many differences as similarities in the two transactions. During the January transaction, Miller drove a Pontiac Grand Am, but in September he was driving a Monte Carlo. Miller was alone during the first drug purchase; during the second, he was accompanied by Nathan Collins.

The similarities between the two crimes, however, were primarily the handiwork of the government: The government directed Lyons to beep Miller, and the government directed that the transaction occur at Lyons' mother's house. The independent similarities are simply that both times Miller arrived in a blue car, picked up Lyons in front of his mother's house, drove him around the block, and gave him cocaine in exchange for money. That is the modus operandi of *every* drug dealer.

The majority goes to great lengths to show that the evidence demonstrated that Miller was in fact the supplier in both instances, but this reasoning misses the point. Rule 404(b) *limits* the admission of evidence of extrinsic acts, regardless of probativeness. Without the requirement of proving a distinctive modus operandi, all extrinsic evidence would be admitted whenever it was likely to prove guilt. It is not enough merely to show that Miller was the supplier in both transactions. The government must go further and demonstrate that "the physical similarity [is] such that it marks the offenses as the handiwork of the accused." *United States v. Beechum*, 582 F.2d 898, 912 n. 15 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). The extrinsic act must be a "signature" crime, and the defendant must have used a modus operandi that is uniquely his. If the January and September transactions are considered a "signature," it is not Miller's signature, but a facsimile produced by the government. Thus, in my view, it was an abuse of discretion for the district court to admit the evidence of the September transaction.

I would affirm Miller's conviction, however, because I believe the jury had suffi-

cient evidence to convict Miller of the January offense even without the evidence of the September transaction. Agents Bledsoe and Harvey both identified Miller as the supplier in the January transaction. Agent Bledsoe had met Miller in 1986 during a prior drug investigation and recognized him when he drove up behind her. Lyons entered Miller's car with money and exited with cocaine. Thus, although the district court abused its discretion in admitting the September transaction into evidence, in this case the error was harmless.

CLARK, Senior Circuit Judge, dissenting:

This case is concerned with the *"manufacturing of crime by law enforcement officials and their agents."* [1] The first crime was planned and engineered to occur January 7, 1987. When the proof of identity from Agents Bledsoe and Harvey was too weak to indict Miller, a second identical crime was manufactured to occur September 3, 1987. The majority states "[w]e conclude that the similarity of the two offenses in this case is sufficient to mark the offenses as the handiwork of the accused." I agree that the two crimes occurred at the same house with the same buyer, Lyons, and that Agent Bledsoe drove the government vehicle and furnished the purchase money. Additionally, on both occasions Miller drove Lyons around the block while exchanging cocaine for the money, and Miller returned Lyons to Lyons' mother's house. The January crime ended with Miller driving away from the house without being apprehended by drug agents who followed him by automobile and airplane. In the September reenactment of the January transaction, however, the agents swarmed around Miller as soon as Lyons left the vehicle.

I conclude that the majority's reasoning is faulty. The majority states at slip op. page 1539: "When extrinsic offense evidence is introduced to prove identity, 'the likeness of the offense is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi.' " [2] It is an inescapable conclusion that the modus operandi was that of the *government* and the similarities were marks of the handiwork of the *government*, not of *Miller.*

The majority's true holding is that when a government-induced sting operation goes sour by not producing enough evidence to indict, the officials are free to repeat the same scenario in an errorless manner, to use the second crime evidence to bolster its insufficient proof in the first incident, and, of course, convict the defendant for the second crime as well.

I believe that limits should be placed on the power of the government in the manufacture of crimes. One of those limits would be to disallow "other crimes" evidence in cases like this one. In this case, the government not only manufactured the crimes, but it did so in order to manufacture evidence to procure a conviction for a prior crime. I would limit the government's case to its second incident and thus only one conviction. The members of this court are aware that a large number of drug convictions arise in situations similar to this one. The government has a suspicion of a party's guilt, so the government sets up an entrapment with the assistance of informers either paid or indebted to the government by way of a promised light sentence. [3]

In several cases, distinguished jurists have raised questions about placing some limitations on government manufactured

---

**1.** This phrase was first used by Justice Harlan in *Lopez v. United States,* 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963).

**2.** Majority at 1539 (citing *Beechum,* 582 F.2d at 912, n. 15).

**3.** In 1989, the United States government paid $63 million to confidential informants. Moreover, ninety percent of all search warrant affidavits filed in the U.S. District Court in Atlanta in 1989 were based at least in part on confidential informants' representations. Mark Curri-

crimes.[4] In *Sherman v. United States,*[5] Justice Frankfurter wrote:

> No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society.[6]

Despite warnings of this kind, we have approved such procedures. In a recent case,[7] informers went to Colombia where they contracted to purchase cocaine from a seller. An FBI agent then flew the drugs to Miami. The Colombia seller came to the United States to insure collection of the funds, and both the seller and the Miami purchaser were convicted.

We should desist from encouraging the government to use entrapment as its primary method of obtaining sufficient evidence to obtain a conviction. Encouraging entrapment serves to discourage the government from obtaining primary evidence of guilt through traditional investigative measures, thereby increasing the possibility of convicting an innocent "targeted suspect."[8] I do not suggest that Miller was innocent. I do suggest that the evidence of the September crime as part of the trial of the January incident was prejudicial to Miller and improperly admitted as 404(b) evidence. I would limit the government to one conviction of Miller—the September indictment.

---

den, *Making Crime Pay,* ABA J., June 1991, at 43.

**4.** *See, e.g., United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 1646–52, 36 L.Ed.2d 366 (1973) (Stewart, J., dissenting) (joined by Brennan and Marshall, JJ.); *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 217–19, 77 L.Ed. 413 (1932) (Roberts, J., concurring) (joined by Brandeis and Stone, JJ.).

**5.** 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

**6.** *Id.* 78 S.Ct. at 826 (Frankfurter, J., concurring) (joined by Douglas, Harlan, and Brennan, JJ.).

**7.** *United States v. Londono,* 958 F.2d 1082 (11th Cir.1992) (unpublished).

**8.** "Federal agents admit there are many professional informers like David S. who have six-digit incomes. They justify paying big bucks to informants for several reasons: It saves police the time and expense of infiltrating a criminal enterprise, and it gives them an operative who can engage in illegal activities that might constitute entrapment if a law enforcement officer performed them." Curriden, *supra* note 3, at 44.