[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12027

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANTHONY LAMON FRAZIER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:20-cr-00300-CLM-GMB-1

_____

Before WILSON, BRASHER, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Anthony Lamon Frazier appeals his conviction for possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Frazier argues that the district court erred by admitting video recordings of a drug dog alerting on his truck during two inspections because the drug-dog inspections were inadmissible character evidence, in violation of Federal Rule of Evidence 404(b). After review, we affirm.

## I.    BACKGROUND

### A. Investigation

In 2019, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began investigating Frazier for his role in an organization trafficking firearms and narcotics in Talladega, Alabama. In the course of the investigation, the Talladega County Drug Task Force (the "Task Force") notified ATF Special Agent Carrie Lane of a confidential informant, Terry Thomas, who said he could purchase narcotics from Frazier.

Thomas had known Frazier since 2017 or 2018, when Thomas accompanied a friend who purchased drugs from Frazier a few times in front of Frazier's house. Thomas also knew Frazier's "business partner," Jeremy "Block" Rivers, who aided Frazier in selling methamphetamine. Thomas had recently talked with

Frazier about purchasing some methamphetamine. After interviewing Thomas, Special Agent Lane planned a "controlled purchase" of methamphetamine between Thomas and Frazier.

Frazier worked for Talladega County and drove a white, Talladega County work truck with the county seal on the side. Special Agent Lane contacted the Talladega County Commission and verified that Frazier was assigned a specific county truck. The Task Force also knew Frazier was assigned a specific white, four-door pickup truck, and the Task Force was unaware of Frazier driving any other truck.

### B. Controlled Purchase in Talladega

On October 10, 2019, the ATF and the Task Force met with Thomas for the controlled purchase. As soon as Thomas arrived, the agents searched Thomas and his vehicle. The agents found no contraband in his vehicle or on his person. The agents provided Thomas with $9,000 to purchase two pounds of methamphetamine.

The agents instructed Thomas to place a recorded call to Frazier to confirm the methamphetamine purchase, and he called the contact in his phone, "Tony." At trial, both Thomas and Special Agent Lane—the latter having listened to "hundreds" of jail calls involving Frazier—confirmed that the voice on the other end of the call was Frazier's. Frazier instructed Thomas to pull up outside "the house," which Thomas testified meant near the railroad tracks "by Block's grandma's house."

After the call, the agents provided Thomas with a cell phone that was also an audio and video recording device. The device was disguised as a cell phone to avoid detection and to make it "safer for the informant." Thomas was instructed not to get out of the car and "not to mess with the device." The agents then turned on the recording device.

Thomas placed the recording device in the vehicle in the seat next to him and departed for the controlled purchase, while the agents stayed behind at the briefing location. The agents did not attempt to get closer because Thomas told them that "the transaction was going to happen [in] a close-knit community" with "lookouts that stand on the street." Therefore, the agents would have stood out and risked endangering themselves or hampering the operation if they attempted to surveil the transaction.

On the way to the transaction, Thomas stopped at a convenience store to buy a lighter and brought the recording device with him to "show[] [his] every move." Thomas did not arrange for anyone to put drugs in his car while he was in the store.

After purchasing the lighter, Thomas went to the meeting spot. Thomas spoke with Block on the cell phone, who told Thomas to wait by the white house. Thomas waited for several minutes for Block to "pull up." At one point, Thomas got out of the vehicle to talk to a group of people that included his cousin to "throw[ ] them off." While waiting, Thomas saw several vehicles near, and in the yard of, Block's house, including a white truck. Thomas attempted to record the vehicles on the device and called

out several tag numbers.  Agents, however, were unable to link any of these tag numbers to Frazier.

Either Block or Frazier texted Thomas to tell him that they were not ready and for Thomas to wait instead at a store called Benny's, located around the corner.  Thomas left the transaction destination and parked outside of Benny's.

Five or ten minutes later, Block arrived at Benny's, and Thomas handed Block the $9,000.  Block told Thomas to wait for a minute "so he could get stuff situated" and drove away.  Although Thomas had the recording device in his car, he did not try to record Block during the money handoff.  Block then called, and Thomas returned to Block's house, circling the block before pulling up next to the railroad tracks.  Thomas again recorded Block's house, pointing out another white truck parked in front.  Initially, Thomas thought this white truck might be Frazier's "city truck," but then realized it was not.

When Thomas stopped and parked on the shoulder of the road next to the tracks, both Block and Frazier told Thomas to wait as they readied the methamphetamine.  Thereafter, Thomas spotted Frazier in the driver's seat of a white "city truck," clearly identifying Frazier as the truck approached him.  Frazier drove past Thomas, turned his vehicle around, pulled over to the same shoulder of the road as Thomas's vehicle and stopped his vehicle directly in front of Thomas's vehicle.  Thomas could see that there was nothing on the shoulder before Frazier pulled over.  Thomas watched Frazier open his driver's side door and drop a bag on the

ground.  Thomas did not try to record the city truck or the drop off with the device because Frazier would have seen him.  After Frazier drove away, Thomas picked up the bag containing "two bricks" of methamphetamine and showed the drugs to the recording device as he got back into the car.

Thomas went directly to the agents and gave them the methamphetamine.  An agent from the Task Force searched Thomas's vehicle and did not find any other contraband.  Tyrone Shire, a Drug Enforcement Administration ("DEA") forensic chemist, analyzed the methamphetamine and found that it contained 93.3 grams of pure methamphetamine.

### C. Positive Drug-Dog Inspections

In August 2020, Chris Rogers, a police officer with the K-9 unit of the Task Force, oversaw two inspections of Frazier's work truck using a dog trained to detect narcotics.  At trial, Officer Rogers testified that his drug dog, Quincey, was "the best [Rogers had] seen" and had a 100% success rate in training situations.  Every time that Quincey made a positive "alert," narcotics were present or had recently been present at the location.  However, Quincey could detect the presence of only narcotics in general and could not tell the difference between drugs, such as marijuana and heroin.

The two drug-dog inspections occurred on August 18 and 30, 2020.  Both times, Frazier's work truck was in a parking lot with other county trucks that were white and looked the same—four or five trucks on August 18, and at least three on August 30.  On both

occasions, Quincey alerted Officer Rogers to the presence of narcotics (presently or recently) in Frazier's truck, the same truck Rogers personally observed Frazier drive. Also on both occasions, the Task Force made a "tactical" decision not to search the truck to determine whether drugs were present.

## II.    PROCEDURAL HISTORY

### A.  Arrest and Indictment

On September 9, 2020, two months after the drug-dog inspections, an arrest warrant was issued, and Frazier was arrested. On September 23, 2020, a grand jury indicted Frazier for possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Frazier pled not guilty.

### B.  Rule 404(b) Motion

Prior to trial, the government provided notice of its intent to introduce the two positive drug-dog inspections of Frazier's county truck as identity evidence under Rule 404(b). The government argued that Frazier's identity "is a material issue for the jury to decide," and by pleading not guilty, "Frazier put his identity squarely at issue."

In response, Frazier filed a motion *in limine* to exclude the inspections evidence. Frazier contended that the videos of the drug-dog inspections were not needed to prove identity because at trial Thomas was going to identify Frazier as the drug dealer, and

the inspections would serve only as inadmissible character evidence.

At a hearing on the motion, Frazier argued that "identification [was] not at issue" because the government had conceded that Thomas "can identify Mr. Frazier." The government responded that it would need the drug-dog inspection evidence because Frazier would try to impeach Thomas. Thus, unless Frazier was willing to stipulate that he was inside the truck during the controlled buy, the government would need the inspections to identify Frazier as being in the white truck.

The district court denied Frazier's motion. The district court found that "identity is an issue," Thomas may or may not be able to prove identity, and the drug-dog inspection evidence was "an additional piece of evidence the government is trying to introduce to prove identity." The district court found that the evidence could prove identity or *modus operandi*, "that it was Mr. Frazier, in other words, it was a signature crime." The district court expressly found that the probative value of the drug-dog inspection evidence outweighed its prejudicial effect. The district court also stated its intent to issue a limiting instruction to the jury when the evidence was admitted.

### C. Jury Trial

At trial, confidential informant Thomas; ATF Agent Lane; Blake McGhee, an officer with the Task Force; Tyrone Shire, a DEA forensic chemist; and Officer Rogers, the Task Force's K-9

handler, all testified to the events as described above. The government introduced into evidence the audio of the phone call between Thomas and Frazier before the controlled buy, as well as the video and audio of the controlled purchase.

Because Thomas left the recording device on the passenger seat next to him for most of the 50-minute recording, the video does not show either Block receiving the money from Thomas or Frazier delivering the drugs to Thomas in his work truck. The recording briefly shows the outside of Block's house as Thomas waits for the drugs and also shows the drugs after Frazier dropped them on the side of the road and Thomas picked them up. The audio recorded Thomas calling out license plate numbers of cars around Block's house, but recorded only Thomas's side of cell phone calls, some of which are unintelligible because Thomas also was listening to music in his car. During his testimony, however, Thomas identified Frazier as the individual in the "city truck" who dropped the methamphetamine on the side of the road.

On cross-examination, defense counsel had Thomas admit that he was "in trouble" and trying to get a deal with the government. Thomas also conceded that the recording failed to describe in real time what Frazier or Block were doing or saying. Further, Thomas admitted he got out of his car twice, even though the agents told him not to do so. Thomas also admitted he spoke with other people who approached his car while he waited for the drugs, including one person who could be heard in the audio recording saying he needed to be paid for working hard.

Counsel also cross-examined the agents, who conceded that Frazier, his work truck, and the actual drug transaction did not appear in Thomas's recording of the controlled buy. In addition, the agents admitted they were unable to link Frazier to the phone number Thomas used to arrange the drug deal or to the tag numbers Thomas saw at Block's house on the day of the controlled buy.

Later in the trial, Officer Rogers, the K-9 handler for the Task Force, testified about the drug-dog inspections. The government moved to introduce the two inspection videos—Exhibits 6 and 7—into evidence, to which Frazier objected. The district court overruled the objection. Before the videos were played for the jury, the district court gave this limiting instruction:

> Government's Exhibits 6 and 7 are going to show acts allegedly done by the defendant on a different occasion that may be similar to acts with which the defendant is currently charged. You can only use this evidence for the limited purpose of[,] if you find that the defendant committed the allegedly similar act, that is, the acts in these videos, you may use this evidence to help you decide whether the similarity between the acts in the videos and the ones charged in the indictment in this case suggest that the same person committed all of the acts. You cannot use this evidence to consider that the defendant has bad character, and you cannot use it to convict the

defendant simply because you believe he may have committed the acts shown in this evidence that is not charged in the indictment.

The two videos show Officer Rogers running his drug dog Quincey around the outside of three identical white pickup trucks in a parking lot. In each, Quincey alerts on the third truck by sitting when he reaches the door of the truck.

On cross examination, Officer Rogers admitted that while Quincey had a 100% success rate in training situations, the officers could not verify whether drugs were actually present in Frazier's work truck. Further, Officer Rogers did not know whether anyone else may have driven Frazier's work truck.

After the government rested, Frazier moved for a judgment of acquittal. Frazier argued that the government's case had "all been innuendo," and that there was "nothing to show . . . that [Frazier] was involved with any type of drug transaction. There's nothing to show that he was there on that day."

The district court denied the motion, pointing out that there was no dispute about the amount of methamphetamine and that "[t]he question is putting the defendant at the scene in possession of it." The district court found that "if you take the confidential informant, Mr. Thomas'[s] testimony in the light most favorable to the government, he puts the defendant there." After the district court's ruling, Frazier rested without presenting any witnesses or evidence.

As part of the jury charges, the district court again instructed the jury that it could use the evidence of "allegedly similar acts . . . to help [it] decide whether the similarity between those acts and the one with which the defendant is charged here suggest that the same person committed all of them." The district court, however, warned the jury that Frazier was "currently on trial only for the charge in the indictment" and the jury could "not convict the defendant simply because [it] believe[d] that he may have committed an act in the past or at another time that is not charged in the indictment."

Frazier's entire theory of defense at trial was that Thomas was lying about Frazier's involvement in the drug deal and that Thomas had opportunities during the controlled buy to obtain the methamphetamine and set Frazier up. During closing arguments, Frazier's defense counsel attacked Thomas's credibility and the lack of evidence connecting Frazier to the controlled purchase. Of Thomas, Frazier's defense counsel said, "He's a liar. He lied to you all." Referring to Thomas's deal with the government, Frazier's defense counsel asked, "Did [Thomas] have a personal interest in the outcome of this case?" Answering his own question, he said, "That's the first thing the government told you, that he has an interest in the outcome of the case." Further, as to the evidence against Frazier, Frazier's defense counsel said, "Not one piece of evidence that [the government has] shows that [Thomas] did a drug deal with my client. Not one. The only thing you have is the [confidential informant]." Defense counsel pointed out that on the

recording, "about a minute and a half" before Thomas showed the two bricks of methamphetamine to the camera, he could be heard speaking to somebody outside of his car who said he needed to be paid. Defense counsel argued that Thomas had lied when he said he gave $9,000 to Block because "[n]obody gives somebody $9,000 on the street and just walks away." In other words, defense counsel implied to the jury that it was this unidentified person, and not Block and Frazier, who conducted the drug deal with Thomas. As to the drug-dog inspections, Frazier's defense counsel emphasized that the only way to know if a drug dog has made a mistake is to "find out whether or not drugs are there," which law enforcement did not do during the two inspections and that the inspections were done 10 months later because "they knew they didn't have a case."

The jury unanimously found Frazier guilty.

### D. Motions for Judgment of Acquittal and New Trial

After the jury verdict, Frazier filed a motion for judgment of acquittal, arguing that the evidence was insufficient to convict him. In particular, Frazier pointed out that: (1) the phone number called before the controlled buy was never verified; (2) Thomas disobeyed the agents' orders by getting out of the car; (3) there was no evidence of Frazier's truck on the recording; (4) there was no picture of Frazier dropping off any drugs; and (5) the drug-dog inspection evidence was unduly prejudicial.

Frazier also filed a motion for new trial. Again, Frazier argued that the verdict was against the weight of evidence and

obtained by false evidence "given by [Thomas] with the intent to convict [Frazier] to obtain a benefit from the Government." Frazier again argued that the videos of the drug-dog inspections were inadmissible.

The government responded that Frazier's motion for new trial should be denied because the 404(b) evidence was offered to prove Frazier's identity. In particular, the government argued that "Frazier's defense presentation, through cross-examination and closing, called into question the confidential informant and case agent's ability to identify Frazier as the one . . . distributing methamphetamine."

The district court denied Frazier's motions. As to the motion for judgment of acquittal, the district court found that "the jury had a right to credit the confidential informant's version of events," and when viewing the evidence in the light most favorable to the government, there was sufficient evidence to convict.

As to the motion for new trial, the district court found, *inter alia*, that for the same reasons it denied the motion for judgment of acquittal, the conviction was not against the weight of the evidence and that the video evidence of the drug dog alerting to the presence of narcotics in Frazier's work truck was properly admitted "to prove Frazier's identity."

As to the 404(b) evidence, the district court found that it was relevant to prove Frazier's identity because, "[t]hroughout trial, Frazier questioned the confidential informant and case agent's

ability to identify him as the person who distributed methamphetamine during the controlled drug buy." Further, "the transportation of drugs in Frazier's work truck was sufficiently similar to the distribution of the methamphetamine during the controlled buy." The district court stressed that Thomas had testified Frazier delivered the methamphetamine to him in his "city" truck and, "[s]everal months later, a drug dog signaled that narcotics had been present in a Talladega County work truck belonging to Frazier and matching the description provided by [Thomas]." The district court found "that the transportation of drugs in a county work truck is not so 'commonplace' that any individual could have done it."

The district court also determined that the government had met its burden to show that the dog accurately detected narcotics inside Frazier's truck, pointing to the dog's training and success rate. Thus, the district court ruled that "a reasonable jury could find by a preponderance of the evidence that Frazier committed the extrinsic act admitted under Rule 404(b)." As to the probative value of the video evidence, the district court found that Frazier's identity was "one of the main issues at trial," and the evidence was not unduly prejudicial, especially in light of the two limiting jury instructions.

## III.    DISCUSSION

On appeal, Frazier does not challenge the district court's denial of his motion for judgment of acquittal or argue that the trial evidence was insufficient to support his conviction. Rather, Frazier

argues that the district court erred by admitting the videos of the two positive drug-dog inspections because the inspections were inadmissible character evidence, in violation of Federal Rule of Evidence 404(b).

"We review a district court's decision to admit evidence pursuant to Rule 404(b) pursuant to the abuse of discretion standard." *United States v. Phaknikone*, 605 F.3d 1099, 1107 (11th Cir. 2010) (quoting *United States v. Brown*, 587 F.3d 1082, 1091 (11th Cir. 2009)).

### A. Rule 404(b)

Under Rule 404(b), evidence of other crimes, wrongs, or acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence may be admissible to show, among other things, identity. Fed. R. Evid. 404(b)(2). "Rule 404(b) is a rule of inclusion . . . [and] 404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case." *Phaknikone*, 605 F.3d at 1108 (quotation marks omitted).

Under our three-part *Miller* test, evidence of other acts is admissible if: (1) the evidence is "relevant to an issue other than the defendant's character"; (2) "as part of the relevance analysis, there [is] sufficient proof so that a jury could find that the defendant committed" the other acts; and (3) "the probative value of the evidence [is not] 'substantially outweighed by its undue prejudice,

and the evidence . . . meet[s] the other requirements of Rule 403.'" *Phaknikone*, 605 F.3d at 1107 (quoting *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc)).  Rule 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The application of the *Miller* test "'varies depending on the issue for which it was offered.'"  *Phaknikone*, 605 F.3d at 1108 (quoting *United States v. Lail*, 846 F.2d 1299, 1301 (11th Cir. 1988) (alteration omitted)).  When admitting extrinsic evidence to prove identity, the standard is "particularly stringent" and, for purposes of the first prong of the *Miller* test, "the likeness of the offenses is the crucial consideration." *Id.* (quotation marks omitted); *see also Miller*, 959 F.2d at 1539 (explaining that the charged offense and the extrinsic offense must be sufficiently similar "to be relevant on the issue of identity").  Put differently, the evidence must be sufficiently similar to "mark the offenses as the handiwork of the accused" and thus "demonstrate a *modus operandi*." *Phaknikone*, 605 F.3d at 1108 (quotation marks omitted); *see also United States v. Whatley*, 719 F.3d 1206, 1217-18 (11th Cir. 2013) (explaining that although the charged and uncharged bank robberies had similarities common to all bank robberies, they also shared "more unusual" similarities that "marked the crimes as the handiwork" of the defendant).  The government's evidence must show more than

the fact that the defendant has committed the same "commonplace variety of criminal act." *Phaknikone*, 605 F.3d at 1108 (quotation marks omitted).

As to the third prong of the *Miller* test, to determine whether the evidence is more probative than prejudicial, a district court must engage in a "common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Brown*, 587 F.3d at 1091 (quotation marks omitted). The central inquiry is whether "the evidence is essential to obtain a conviction," or "the government can do without such evidence." *United States v. Pollock*, 926 F.2d 1044, 1049 (11th Cir. 1991). In reviewing the third prong of the *Miller* test under Rule 403, we "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Edouard*, 485 F.3d 1324, 1344 n.8 (11th Cir. 2007) (quotation marks omitted).

## B. Frazier's Claim

Here, we cannot say the district court abused its considerable discretion in admitting the video evidence of the drug-dog inspections under Rule 404(b). The evidence was relevant to, and probative of, Frazier's identity as the person who delivered the

methamphetamine to Thomas and any potential unfair prejudice was mitigated by the district court's limiting instructions.[1]

As to the first prong of the *Miller* test, Frazier's having narcotics in his county-issued work truck on two other occasions within ten months of the controlled buy is relevant to whether Frazier delivered the methamphetamine to Thomas in his work truck during the controlled buy. Although Thomas argues that his possession of some unknown quantity and type of narcotics in his work truck is not sufficiently similar to his delivery of methamphetamine to Thomas on the day of the drug deal to be relevant, we conclude Frazier's use of his county-issued work truck provided sufficient similarity "to mark the offenses as the handiwork of the accused." *See Miller*, 959 F.2d at 1539. As the district court observed, the use of a county work truck to carry drugs would not be so commonplace that anyone could have done so. In short, we agree with the district court that the drug-dog inspection evidence could be used by the government to show a signature trait—that Frazier used his work truck to carry narcotics—and therefore Frazier was the person who delivered the methamphetamine to Thomas during the controlled buy.

---

[1] In a footnote, Frazier encourages this Court to adopt the Seventh Circuit's "propensity-free chain of reasoning" analysis for Rule 404(b) purposes. *See United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc). A passing reference without reasoned analysis "is insufficient to preserve the argument on appeal." *United States v. Stein*, 846 F.3d 1135, 1151 n.15 (11th Cir. 2017).

The second prong of the *Miller* test is also satisfied. Officer Rogers testified that his drug dog, Quincey, detected the presence of narcotics (either current or very recent) in Frazier's work truck during two separate inspections occurring twelve days apart. During each inspection, Quincey picked Frazier's work truck out of at least three, and as many as five, work trucks in a parking lot. According to Officer Rogers, Quincey had a 100% success rate in training situations and was "the best" drug detection dog Rogers had ever seen. The two videos show Officer Rogers leading Quincey around the outside of three trucks and Quincey sitting—his alert to the presence of narcotics—at the door of the third truck. From this evidence, a jury could find that Frazier possessed narcotics in his truck on two occasions in August 2020.

Finally, as to the third prong, we cannot say the probative value of the drug-dog inspection evidence is "substantially outweighed" by unfair prejudice. The two positive drug-dog inspections had probative value as to the primary contested issue at trial—whether it was Frazier who delivered the drugs to Thomas during the controlled buy. Because the government lacked other strong evidence of Frazier's identity as the delivery person, the government's case rested almost exclusively on the testimony of Thomas.

Frazier's trial strategy was to discredit Thomas's testimony through vigorous cross-examination that highlighted the inconsistencies in his testimony, his failure to follow the agents' instructions in conducting the controlled buy, and the lack of

corroborating evidence on the video recording of the controlled buy. During closing argument, Frazier argued, based on these weaknesses, that Thomas's claim that Frazier brought him the drugs in his "city truck" was not credible and instead Thomas had set Frazier up for his own benefit. In light of Frazier's defense, the drug-dog inspection evidence—indicating that on at least two other occasions roughly ten months after the controlled buy, Frazier had possessed narcotics in his work truck—was an important component of the government's case. Indeed, on appeal Frazier admits the government needed the evidence, stating that at trial there was "no evidence, independent of [Thomas's] testimony, that anyone in any white municipal work vehicle dropped off the drugs." See United States v. Delgado, 56 F.3d 1357, 1366 (11th Cir. 1995) (explaining that the greater the government's need for the Rule 404(b) evidence, "the more likely that the probative value will outweigh any possible prejudice").

Frazier contends that whether he was the driver of the white "city truck" who dropped off the drugs was "not even a question" at trial, and instead the "real question" was whether Thomas was telling the truth or had "falsely attribut[ed]" the drug deal to Frazier. But this argument ignores the fact that "[t]he jury was entitled to believe as much or as little of the witnesses' testimony as it found credible." See United States v. Matthews, 431 F.3d 1296, 1312 (11th Cir. 2005) (concluding the probative value of a prior drug arrest on the issue of intent was not substantially outweighed by undue prejudice because, although government witnesses

testified that the defendant intended to join the drug conspiracy, the jury could have disbelieved those witnesses).  In other words, the jury could have found that someone delivered the methamphetamine to Thomas in a county work truck without believing Thomas's testimony that it was Frazier.  Therefore, the drug-dog inspection evidence was necessary to prove to the jury Frazier's identity as the driver of the work truck.

As for prejudice, this Court has found that "extrinsic drug offenses do not tend to incite a jury to an irrational decision." *See Delgado*, 56 F.3d at 1366.  Moreover, the district court twice gave the jury a limiting instruction that mitigated the risk of undue prejudice. *See United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998) (explaining that a district court's jury instruction as to the limited purpose of other-acts evidence diminishes its prejudicial effect).  Specifically, the district court instructed the jury to consider the video evidence of the drug-dog inspections only to determine whether Frazier was the person who committed the charged offense and not to determine Frazier's bad character.  It further warned the jury that it could convict Frazier of only the offense charged in the indictment and could not find Frazier guilty merely because he may have committed the other acts of drug possession established by the drug-dog inspections.  We must presume the jury followed the district court's limiting instructions. *See United States v. Pon*, 963 F.3d 1207, 1238 (11th Cir. 2020).

In sum, all three prongs of the *Miller* test are satisfied.  Accordingly, we cannot say the district court abused its discretion

21-12027                Opinion of the Court                23

in admitting the drug-dog inspection evidence to prove Frazier's identity as the person who delivered the methamphetamine to Thomas during the controlled buy.

**AFFIRMED.**